IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| EXXONMOBIL OIL CORPORATION, | § | |
| *Petitioner/Movant* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | |
| UNITED STEEL, PAPER AND | § | PETITION/MOTION TO VACATE |
| FORESTRY, RUBBER, | § | ARBITRATION AWARD |
| MANUFACTURING, ENERGY, | § | |
| ALLIED-INDUSTRIAL AND SERVICE | § | |
| WORKERS INTERNATIONAL UNION, | § | |
| AFL-CIO LOCAL 13-243 | § | |
| *Respondent* | § | |

---

# PETITION/MOTION TO VACATE ARBITRATION AWARD

---

Michele Y. Smith, Of Counsel
Texas Bar No. 00785296
michelesmith@mehaffyweber.com
Maryalyce W. Cox, Of Counsel
Texas Bar No. 24009203
maryalycecox@mehaffyweber.com
Patricia D. Chamblin
Texas Bar No. 04086400
patriciachamblin@mehaffyweber.com
MehaffyWeber, P.C.
2615 Calder Avenue, Suite 800
Beaumont, Texas 77702
Telephone:  (409) 835-5011
Telecopier:  (409) 835-5177

ATTORNEYS FOR PETITIONER/MOVANT, EXXONMOBIL OIL CORPORATION

# TABLE OF CONTENTS

Table of Contents ........................................................................................................ 2

Index of Authorities ................................................................................................... 3

Petition/Motion to Vacate Arbitration Award ......................................................... 5

    I.      Introduction ................................................................................................. 5

    II.     The Parties ................................................................................................... 5

    III.    Jurisdiction and Venue................................................................................ 6

    IV.    Statement of the Case.................................................................................. 6

    V.     Grounds for Vacating the Award ................................................................ 8

    VI.    Statement of Facts....................................................................................... 9

    VII.   Argument & Authorities ............................................................................ 23

           A.      The Arbitrator exceeded his authority. ...................................... 23

                   1.      The Arbitrator exceeded his authority in considering post-termination letters written by Holman's physician. ................................................................... 24

                   2.      The arbitrator exceeded his authority when he improperly considered his own medical experiences in his decision-making. ................................................ 29

           B.      There is evident partiality by the Arbitrator. ............................ 30

                   1.      Actual Bias.................................................................... 31

                     2.      Non-Disclosure ............................................................ 35

           C.      The Award was not based on the facts of the case and was therefore arbitrary and capricious. ........................................... 37

    VIII.  Conclusion ................................................................................................ 39

Certificate of Service ................................................................................................ 40

## <u>INDEX OF AUTHORITIES</u>

**Cases**

*Ainsworth v. Skurnick,*
   960 F.2d 939 (11th Cir. 1992) ................................................................. 38

*Am. Eagle Airlines, Inc. v. Air Line Pilots Assn,*
   343 F.3d 401 (5th Cir. 2003) ........................................................... 24, 27

*Bruce Hardwood Floors, Division of Triangle Pacific Corp. v. UBC, Southern
   Council of Industrial Workers, Local Union No. 2713,*
   103 F.3d 449 (5th Cir. 1997) ................................................................. 23

*Cooper v. Westend Capital Management, L.L.C.,*
   832 F.3d 534 (5th Cir. 2016) ................................................................. 30

*Delta Queen Steamboat Co v. Dist. 2 Marine Eng'rs Beneficial Ass'n,*
   889 F.2d 599 (5th Cir. 1989) ................................................................. 23

*Gulf Coast Indus. Workers Union v. Exxon Co., USA,*
   991 F.2d 244 (5th Cir. 1993) ................................................. 23, 25, 26, 28, 39

*Hous. Lighting & Power Co. v. Int.'l Bhd. of Elec. Workers, Local Union No. 66,*
   71 F.3d 179 (5th Cir. 1995) ................................................................. 23

*Householder Grp. v. Caughran,*
   354 Fed. Appx. 848 (5th Cir. 2009) ...................................................... 31

*International Ass'n of Machinists v. Hayes Corp.,*
   296 F.2d 238 (5th Cir. 1961) ................................................................. 37

*Lummus Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.,*
   256 F.Supp.2d 594 (S.D. Tex. 2002) ..................................................... 38

*Positive Software Solutions, Inc., v. New Century Mortg. Corp.,*
   476 F.3d 278 (5th Cir. 2007) ........................................................... 30, 36

*Safeway Stores v. Am. Bakery and Confectionery Worker's Int'l Union Local 111,*
   390 F.2d 79 (5th Cir. 1968) ................................................................. 37

*STP Nuclear Operating Co., Inc. v. Int'l Bhd. of Elec. Workers Local Union No.
   66,*
   No. H-05-3561, 2006 WL 1877099 (S.D. Tex. July 6, 2006) ........................ 27, 28

*United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.,*
   484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) ................................ 24

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.*,
   363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)............................................................. 38

*Webber v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
   455 F.Supp2d 545 (N.D. Tex. 2006) .................................................................................... 31

**Federal Statutes**

9 U.S.C.A. § 10 ......................................................................................................................... 6

28 U.S.C.A. § 1331 .................................................................................................................... 6

28 U.S.C.A. § 1337 .................................................................................................................... 6

28 U.S.C.A. § 1391 .................................................................................................................... 6

29 U.S.C.A. § 142 ...................................................................................................................... 5

29 U.S.C.A. § 152 ...................................................................................................................... 5

29 U.S.C.A. § 185 ................................................................................................................... 5, 6

29 CFR § 1404.13 .................................................................................................................... 30

29 CFR Ch. XII ........................................................................................................................ 30

# PETITION/MOTION TO VACATE ARBITRATION AWARD

Petitioner/Movant, ExxonMobil Oil Corporation ("Petitioner/Movant" or the "Company"), complains of Respondent, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, AFL-CIO Local 13-243 ("Respondent" or the "Union") and respectfully requests the Court to vacate the arbitration award and enjoin its enforcement.

## I.    INTRODUCTION

1.    This action is brought under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185 ("LMRA"[1]), and Section 10 of the Federal Arbitration Act ("FAA"), and seeks to vacate and enjoin enforcement of the Opinion and Award of the Arbitrator, Robert E. Allen, dated April 13, 2020, styled the Anthony Holman Termination, FMCS Case No. 190501-06705. The Opinion and Award ("Award") is attached as Exhibit A.  The Award related to a collective bargaining agreement ("Agreement" or "CBA") between the Company and the Union.  Selected excerpts from the CBA are attached as Exhibit B; the complete CBA is attached hereto as Exhibit G, Joint Exhibit 1.[2]

## II.    THE PARTIES

2.    The Company operates an oil refinery located in Beaumont, Texas; the refinery converts crude oil into petroleum products such as gasoline. Exhibit A, p. 2. The Company has a place of business in Beaumont, Texas, which is within the territorial jurisdiction of this Court. The Company is an employer in an industry affecting commerce as defined in the LMRA (29 U.S.C.A. §§ 142(1), (3), 152(2)) and within the meaning of 29 U.S.C.A. § 185.

---

[1] The LMRA is located at 29 U.S.C.A. §§ 141-187.
[2] The Company redacted certain confidential wage information contained in the exhibits to the CBA beginning at page 38 of Joint Exhibit 1.

3.      The Union is a labor organization representing employees in an industry affecting commerce, as defined in the LMRA (29 U.S.C.A. §§ 142(1), (3), 152(2)) and within the meaning of 29 U.S.C.A. § 185.

4.      The Union may be served with process through its attorney, Jacqueline Ryall of the Provost Umphrey Law Firm.  Ms. Ryall has agreed to accept service of process on behalf of the Union, and, as agreed, she has been served with this Petition/Motion via email.

## III.   JURISDICTION AND VENUE

5.      This case arises under 29 U.S.C.A. § 185 and 9 U.S.C.A. § 10.  Accordingly, this Court has jurisdiction under 28 U.S.C.A. §§ 1331, 1337, 29 U.S.C.A. § 185(c)(2), and 9 U.S.C.A. § 10.

6.      Venue is proper in this District under 28 U.S.C.A. § 1391(b) because the Union is a resident of, is found within, has offices and agents within, and transacts business in this District, and because the acts that led up to this action, including the arbitration hearing, occurred in this District.

## IV.   STATEMENT OF THE CASE

7.      The Company and the Union are parties to a CBA effective June 26, 2015 to January 31, 2021 or until terminated. Exhibit B.  This dispute arose under that CBA.  Relevant provisions of the CBA include Articles III, VI, VII, and XI:

### ARTICLE III – MANAGEMENT RIGHTS

It is understood and agreed that Management possesses all rights, powers, or authority that it had prior to signing of this Agreement except those specifically abridged, delegated, granted, or modified by this Agreement.  Nothing herein shall conflict with valid labor laws.

### ARTICLE VI – GRIEVANCE PROCEDURE

### Section 5 – Discharge Grievance

(A)     In cases of discharge of an employee, the employee may through the Union Representative file a grievance within ten (10) days following the discharge directly with the Refinery Manager who shall render a written decision within ten (10) days of receipt of the complaint.

(B)     It is agreed that if the grievance is not adjusted to the satisfaction of the complaining party, the procedure for arbitration shall be invoked, by a demand for arbitration by the Workmen's Committee, which sets forth the clause of clauses of the Agreement alleged to have been violated and the adjustment requested.

## ARTICLE VII – ARBITRATION

### Section 4 – Decision of Arbitrator
It is understood and agreed that the Arbitration Board shall not have the right to make a decision that would in any way modify, change, add to or delete any of the terms or provisions of the Agreement. The parties also agree to request that the Arbitration Board render a decision within sixty (60) days of the close of the hearing.

## ARTICLE XI – DISCHARGE, SUSPENSION AND RESIGNATION

### Section 1 – Discipline
The Company reserves the right to discipline, suspend or discharge any employee for just cause.

### Section 2 – Employee Rights
When an employee is discharged or resigns, he shall immediately lose all rights and benefits as an employee except the right to complain of such discharge under Article VI (Grievance Procedure) and Article VII (Arbitration) of this Agreement. . . .

8.     A grievance arose following USW-represented employee Anthony Holman's termination on January 22, 2019. Exhibit A, p. 2.

9.     The grievance proceeded through the various steps of the grievance process, culminating in a request for arbitration.

10.     As authorized by the CBA, the parties used the Federal Mediation and Conciliation Service to select the Arbitrator. Exhibit B, Article VII, § 2.  The Arbitrator, Robert E. Allen, was subject to the FMCS' Code of Professional Responsibility for Labor-Management Arbitrators. Exhibit C.

11.     The parties agreed to the arbitration hearing date. The arbitration hearing was held in Beaumont, Texas on February 5-6, 2020. The court reporter's affidavit is attached as Exhibit D. The transcript for day one of the hearing is attached as Exhibit E.[3]  The transcript for day two is attached as Exhibit F.  The arbitration hearing exhibits are attached as Exhibit G, but they will be referred by exhibit number only, i.e. Joint Exhibit 1, Company Exhibit 1, and Union Exhibit 1. The Company redacted certain personal identifying information in the Exhibits.

12.     The Company and Union agreed that the issue to be decided was:

> *Did the Company have just cause to terminate Mr. Anthony Holman? If not, what is the appropriate remedy?*

Exhibit A, p. 1.

13.     Following the hearing, the Arbitrator issued his Award. Exhibit A.  The Arbitrator determined that the Company did not have just cause to terminate Mr. Anthony Holman.[4] Exhibit A, p. 32. As a remedy, the Arbitrator directed the Company to reinstate Holman to his former position with no loss of seniority and to make him whole for lost wages and benefits. *Id.* The Company was also directed to remove any reference to this discipline from his personnel records. *Id.*

14.     The Company now files this petition/motion to vacate that award and enjoin its enforcement.

## V.     GROUNDS FOR VACATING THE AWARD

15.     The award of the Arbitrator should be vacated on the following independent grounds:

---

[3] References to the transcript will be by Exhibit Number, volume number, and page number. (i.e. Exhibit E, 1:x or Exhibit F,  2:x).
[4] In the interest of brevity, Mr. Anthony Holman will be called "Holman."

a.     The Arbitrator exceeded his powers by basing his Award, in which he determined

that there was no just cause for Holman's termination, on two letters written by

Holman's personal physician, Dr. James Mathis, several months after Holman's

termination and a month or more after the conclusion of his grievance process

and, additionally, by basing his Opinion and Award on his own medical

experiences, rather than the arbitration record.

b.     There is evidence of evident partiality by the Arbitrator.

c.     The Arbitrator's Award was not based on the facts of the case and was therefore

arbitrary and capricious.

## VI.     STATEMENT OF FACTS

### November 29, 2018: Injury Report and Initial Medical Treatment

16.     On November 29, 2018, Holman reported an on-the-job injury to his right hip.
Exhibit A, p. 2. He was taken to the Company's Medical and Occupation Health Department
("MOH") where he was seen by Dr. Susan Craig, a physician who serves as the Company's
occupation health manager. *Id*. at 4.  Because Holman had artificial hip replacement surgery on
the right hip a few years earlier, Dr. Craig directed that Holman be taken for further evaluation.
*Id*. Holman was evaluated at Victory Hospital.[5] *Id.*

17.     Holman was transported to the Victory Emergency Room by his supervisor.
Company Exhibit, p. 1.  X-rays were performed (Award, p. 4) as well as a CAT scan. Exhibit E,
1: 131. The x-rays and CAT scan confirmed that Holman had a previous total hip replacement of
his right hip, but did not reveal any evidence of a hip fracture. *Id.* A Texas Worker's
Compensation Work Status Report was completed at Victory.  Company Exhibit 6, p. 30.  Under

---

[5] This facility was also called "The Medical Center of Southeast Texas Victory Campus" and "The Medical Center
of Southeast Texas Beaumont Campus." Company Exhibit 6, pp. 29, 30.

the Work Status Information section of that report, the treating doctor checked:  "I will allow the employee to return to work as of 11/29/18 <u>without restrictions</u>."  *Id.  See also* Exhibit E, 1: 131-132.

### November 30 to December 5, 2018

18.     Holman advised the Company's MOH that he would feel more comfortable if he were also evaluated by Dr. James Mathis, the physician who performed his hip surgery in 2009. Exhibit E, 1:132.

19.     On November 30, the morning after the accident, MOH scheduled an appointment with Dr. Mathis and notified Holman. Company Exhibit 6, p. 1. Holman saw Dr. Mathis as scheduled on December 5, 2018. Exhibit A, p. 4.

20.     Although Victory had released Holman to return to duty without restrictions, Holman was off work with pay pending the results of alcohol and drug testing.  Exhibit E, 1:32, 35. Such tests are routinely performed following an accident or injury. Exhibit E, 1:32.

21.     Holman's alcohol and drug test came back negative on December 5, 2018, which was the day of Holman's appointment with Dr. Mathis. Exhibit E, 11:35, Company Exhibit 6, p. 21.

### December 5, 2018: Dr. Mathis

22.     On December 5, 2018, Holman visited Dr. Mathis to determine whether the incident had damaged his artificial hip joint. Exhibit A, p. 4.  Dr. Mathis determined that there were no problems with Holman's artificial hip joint. *Id.* According to the Arbitrator, Dr. Mathis

diagnosed the problem as a deep bruise[6] and prescribed a muscle relaxant and an anti-inflammatory. *Id.*

23. During that visit, Dr. Mathis filed out a Texas Workers' Compensation Work Status Report, which is Joint Exhibit 23. Exhibit A, p. 4. The Report is a State of Texas-issued form that treating physicians complete after each patient visit for a workers' compensation injury.[7] Exhibit E, 1:139. The report requires the physician to specify "Activity Restrictions" for the patient. The Activity Restrictions section of the Report applies both on and off the job. Joint Exhibit 23. In fact, the form specifically states: "Note—the restrictions should be followed outside of work as well as at work." Both Dr. Mathis and Mr. Holman signed the Work Status Report. *Id.* Dr. Mathis, who was an orthopedic surgeon who practiced with Texas Orthopaedics & Sports Medicine; he had filled out these forms before. Union Exhibit 1; Exhibit E, 2:343.

24. The Texas Workers' Compensation Work Status Report filled out by Dr. Mathis on December 5 included a list of Activity Restrictions to be followed by Holman while he was recuperating. Exhibit A, p. 4. The Report stated that Holman was allowed to return to work as of December 7, 2018 with the specified restrictions, which were expected to last through January 23, 2019. Joint Exhibit 23. Holman was to see Dr. Mathis again on January 16, 2019. *Id.*

25. Dr. Craig talked to Dr. Mathis on December 5, after Holman's visit. Exhibit E, 1:138. Dr. Mathis told Dr. Craig that he was comfortable that Holman had not done any damage to his hip joint replacement. *Id.* That day, Dr. Mathis also told Dr. Craig that he had completed the Work Status Report. *Id.* Dr. Mathis did not provide Dr. Craig with any information relating to restrictions aside from what was contained within the Work Status Report. Exhibit E, 1:141.

---

[6] Holman told MOH that Dr. Mathis said he had a deep bruise. *See e.g.* Company Exhibit 6, p. 3. Dr. Mathis' December 5, 2018 records actually state "strained hip" (Company Exhibit 6, p. 21), and the Workers' Comp form Dr. Mathis filled out states "right hip" under Work Injury Diagnosis (Company Exhibit 6, p. 18).
[7] This is State of Texas Form DWC Form–73. Joint Exhibit 23.

**Work Status Report**

26.     Holman delivered the Work Status Report to MOH.   Exhibit A, p. 4.   The restrictions identified on that form by Dr. Mathis were "Activity Restrictions"—not "Work Restrictions." Joint Exhibit 23; Exhibit E, 1:140.   The "Activity Restrictions" detailed by Dr. Mathis on the Work Status Report were:

> Standing—maximum of two hours per day
>
> Kneeling/squatting—no hours per day
>
> Bending/stooping—no hours per day
>
> Pushing/Pulling—no hours per day
>
> Twisting—no hours per day
>
> Walking—maximum of two hours per day
>
> Climbing stairs/ladders—no hours per day

The Report that was completed by Dr. Mathis stated that the Activity Restrictions applied outside of work as well as at work and was signed by Holman and Dr. Mathis. Joint Exhibit 23.

**315 Form and Return to Work**

27.     After MOH received the Work Status Report, it restated the restrictions on an internal document, the 315 form, which is used by refinery management to guide the placement of workers with restrictions into work assignments compatible with their limitations. Exhibit A, p. 5.   A 315 form was prepared for Holman setting the restrictions applicable to his return to work on December 7, 2018. Joint Exhibit 8.

28.     Holman returned to work on December 7, 2018 in a restricted duty capacity that had him getting caught up on his computer-based training.   Exhibit A, p. 5.   He worked six shifts (December 7, 8, 9, 11, 12, and 13) and then was told there was no more work available for him

to perform given his restrictions. *Id.* and Exhibit E, 1:40-41.   Holman then started receiving workers compensation benefits.  Exhibit E, 1:33, 41; Exhibit F, 2:325-326.

### Medical Treatment between Holman's First Two Visits to Dr. Mathis

29.     Holman first saw Dr. Mathis on December 5, 2018 and saw him a second time on January 16, 2019.  Between Holman's first visit to Dr. Mathis on December 5, 2018 and his second visit on January 16, 2019, MOH was in regular contact with Holman via text, phone calls, and in person visits. Company Exhibit 1;[8] Company Exhibit 6, pp. 1-17.

### Release to Return to Work without Restrictions

30.     Holman returned to Dr. Mathis on January 16, 2019 and, at that time, he was released to return to work without restrictions on January 18, 2019. Company Exhibit 6, p.13.

31.     Holman presented the Release to MOH on January 17 with plans to return to work on January 18, 2019. *Id.*

### Company's Investigation

32.     Meanwhile, shortly after the November 29, 2018 incident, a Company safety team investigated the event.[9] Exhibit A, p. 5. Holman claimed that while he was doing what he needed to do to close a valve, he was pinned between the positioning arm and the valve's metal housing. *Id.* at 3.   However, the Safety Team was unable to replicate a scenario in which anyone Holman's size or larger would be caught between the positioning arm and the metal housing of the delta valve, and injured as a result. *Id.* at 5. This conclusion, as well as other information, raised suspicions about Holman's injury. *Id.* There was a problem with the timeline for the

---

[8] Company Exhibit 1 is a power point with embedded video. The exhibit attached hereto is a pdf that does not contain the embedded video.  A CD containing the power point and the embedded video has been or will be delivered to the District Clerk's office. Union's counsel is receiving a flash drive with the same power point and embedded video.

[9] The Arbitrator wrote that the Company did not interview Holman about the accident.  Exhibit A, p.24.  Holman signed a written statement about the accident. Exhibit F, 2:322-324. Holman said that the statement (Company Exhibit 7) was his version of the accident and that he never changed it.  Exhibit F, 2:323-324.

incident. *Id.* Records indicated that the delta valve closed at 10:21 a.m. but Holman did not report that he had been injured for another hour. *Id.* It seemed incongruous to Company representatives that he was well enough to complete the drum change process if he had been injured as he had claimed. *Id.*

33.     Holman's history of absences from work also contributed to concerns regarding his report of injury. *Id.* He had a history of calling in sick or injured during the month of December in several previous years. *Id.* In fact, Company records showed that Holman, who went to work for the Company on June 23, 2014 (Exhibit F, 2:236), took considerable sick leave in December 2015, 2016, and 2017—including Christmas Eve and Christmas Day of all three years and New Year's Eve and New Year's Day of the previous two years.[10] Joint Exhibit 3, p. 15.  Holman even admitted that he had a history of missing work in December.  Exhibit F, 2:299-303.  In fact, when asked if there was "some kind of pattern "that he was off every December, Holman agreed. Exhibit F, 2:302-303.

34.     Based on the Company's suspicions, the Company hired an independent investigation firm to conduct surveillance on Holman.  Exhibit A, p. 5.  The Company rarely conducts surveillance on employees and does not make the decision lightly.  Exhibit E, 1:45. The Company retained Texas Investigative Network to conduct the surveillance. Exhibit E, 1:47.

35.     The surveillance company obtained time-stamped photos and videos of Holman dated 12/5/18, 12/6/18, 12/7/18, 12/8/19, 12/9/18, 12/12/18, 12/13/18, and 12/16/18. Company Exhibits 1, 3 (p. 5).  Holman did not deny that the photos or videos were of him or that they accurately depicted his activities.  The only challenge he made to the photos and videos was that he claimed he washed his truck on December 23, not December 16 as date-stamped on the

---

[10] If an employee is not present for his or her assigned shift, then someone else has to work that shift.  Exhibit E, 1:19.

photos and videos.  Exhibit E, 2:277.  The Company provided an email documenting that the car

wash surveillance videos were properly dated December 16, 2018.  Company Exhibit 8.  *See also*

Joint Exhibit 17.

36.     Based upon information from the MOH and the surveillance, the following

timeline was established:

| | |
|---|---|
| 11/29/18 | Incident; Victory releases Holman to return to work with no restrictions[11] |
| 11/30/18 | MOH schedules an appointment with Dr. Mathis per Holman's request[12] |
| 12/5/18 | Holman sees Dr. Mathis; Dr. Mathis' records reflect that Holman said, for example, it was difficult to do the following: drive, get in or out of car, stand, sit, walk, shop, yard work, bathe.  He also stated the following applied to him: (1) the pain is starting to affect my daily living, (2) the pain is affecting all stages of my life at this point, (3) the severe pain is restricting me from performing my daily job operations and daily living, and (4) the pain and symptoms cause me to have difficulty completing community errands.[13] |
| 12/5/18 | Surveillance showing Holman after visit to Dr. Mathis visiting Buc-ee's without crutches.[14]  [Note: Although Holman arrived at Dr. Mathis' office on crutches and left the office on crutches, he admitted that less than an hour later, he went into Buc-ee's without crutches. Transcript 2:284, 287-88, 347]. |
| 12/6/18 | Dr. Craig's notes state that Holman presented to Company Clinic using crutches due to pain when he places his weight on his right hip.[15]  [Note:  Holman testified that no doctor ordered crutches. Exhibit E, 2:268].  Dr. Craig also noted that Holman said Dr. Mathis gave him a muscle relaxer to help him rest at night. Holman says he is now sleeping in a recliner.[16] |

---

[11] Company Exhibit 6, p. 30.
[12] Exhibit E, 1:132
[13] Company Exhibit 6, pp. 19-20.
[14] Company Exhibit 1.
[15] Company Exhibit 6, p. 3
[16] Company Exhibit 6, p. 3.

| 12/7/18 | Text between Kristi Sonnier, Dr. Craig's nurse practitioner[17], and Holman, who was apparently at work. |
|---|---|

| | Kristi: | Good afternoon this is Kristi from medical.[18] I just wanted to check with you and see how your day went today. |
|---|---|---|

| | Holman: | Horrible,..really uncomfortable out here on crutches. |
|---|---|---|

| 12/8/18 | Surveillance showing Holman shopping at HEB and exiting truck at home without crutches.[19] |
|---|---|

| 12/9/18 | Text from Dr. Craig to Holman at 3:59 p.m.[20] |
|---|---|

| | Dr. Craig to Holman: | "Just checking on you.  How has the weekend been?  Why don't you plan to come to medical tomorrow..." |
|---|---|---|

| | Holman reply: | "Horrible.  No I'm off tomorrow and I come back Tuesday night." |
|---|---|---|

| 12/9/18 | Dr. Craig's note[21] states: "When I reached out to Mr. Holman this afternoon (12/9/18) and asked how the weekend has been going, he reported 'horrible.' I asked that he report to medical for a reassessment before he left work, which he did. He arrived and exited on crutches." Dr. Craig noted that Holman said he was taking the NSAID daily and hasn't been taking the muscle relaxer except some nights.  He also said that "he hurt just as much at home as at work."  "He is using his crutches to take the pressure off the right hip."  "He states that it continues to hurt when he places all his weight on the right hip."  "Walking with a limp on his crutches." |
|---|---|

| 12/9/18 | Surveillance at 5:20 p.m. shows Holman at Whataburger with no crutches.[22] |
|---|---|

| 12/9/18 | Surveillance at 5:55 p.m. shows Holman exiting truck, walking without crutches.[23] |
|---|---|

---

[17] Company Exhibit 1.
[18] Company Exhibit 1.
[19] Company Exhibit 1.
[20] Company Exhibit 1; Company Exhibit 6, p. 5.
[21] Company Exhibit 6, p. 5.
[22] Company Exhibit 1.
[23] Company Exhibit 1.

| | |
|---|---|
| 12/12/18 | Surveillance at 3:16 p.m. shows Holman walking without crutches at home.[24] |
| 12/13/18 | In her note of December 17, 2018,[25] Dr. Craig documents a conversation she had with Holman on Thursday, December 13, when she called to confirm his appointment for December 14. He said he was at work that day but was told not to report back until he is better.  "He did tell me he was still using the crutches and was no better or no worse."  He said he had personal plans in Houston on Friday and could not come in for the appointment. |
| 12/16/18 | Surveillance showing Holman violating restrictions at the car wash by climbing truck,[26] bending/stooping, and twisting. [Note: Holman admits to The Texas Workforce Commission that climbing truck violated medical restrictions.  Joint Exhibit 14, p. 12-A.] |
| 12/17/18 | Dr. Craig's note[27] says he reported to the clinic without crutches. He said he decided to stop using them on 12/15. He said his pain is a little better.  He walked in slowly without crutches. |
| 12/28/18 | MOH Nurse Practitioner K. Sonnier's note[28] states that Holman says his discomfort continues to improve. Reports mild discomfort. No NSAIDs or muscle relaxants for seven days. |
| 1/7/19 | Dr. Craig's note[29] says Holman continues to improve. Dr. Craig reviewed Dr. Mathis' limitations with Holman. Holman says he can perform the tasks required except that (1) with respect to kneeling/squatting, he thinks he can do it but has only done it once when he dropped his keys, and (2) with respect to stairs, he thinks he can climb them slowly but is not sure about ladders.<br><br>Dr. Craig talked to Holman about returning early to see Dr. Mathis. He "[s]tates he doesn't want to do that and will wait until his appointment to discuss his work status with Dr. Mathis."[30] *See also* Exhibit F, 2:282-83. |
| 1/17/19 | Nurse K. Sonnier's note[31] states that Holman presents to MOH with release to return to work from Dr. Mathis for 1/18/19. He says he is eager to return to work but is apprehensive since he has not |

---

[24] Company Exhibit 1.
[25] Company Exhibit 6, p. 7
[26] Company Exhibit 1, "Violation of Restrictions #1."
[27] Company Exhibit 6, p. 7.
[28] Company Exhibit 6, p.11.
[29] Company Exhibit 6, p. 9.
[30] Company Exhibit 6, p. 9.
[31] Company Exhibit 6, p. 13.

climbed any steps yet.  Employee was released to return to work on 1/18/19 and encouraged to communicate his concerns with his supervisor. Follow-up appointment with Dr. Mathis in two months.

37.    "Veracity Conclusion" in the Company's investigation included the following:

·    that the Holman had  a pattern of repeated call-offs;

·    that Holman complained of immense pain and inability to walk without crutches but was seen at the same time (outside of work) walking and climbing into his vehicle unassisted, climbing into the bed of his truck, washing his vehicle, pushing grocery carts, bending, stooping, twisting, pushing, and pulling . . .

Company Exhibit 2, p. 11.

## Termination

38.    Rather than returning Holman to work, the Company decided to terminate him. Exhibit A, p. 6.  Based on the surveillance videos and Dr. Craig's medical opinion, the Company determined that Holman had violated his medical restrictions. *Id.*  The Company also asserted that Holman's actions constituted a substantial misrepresentation of the facts of his case, which violated Company policy including its Workplace Conduct Expectations (Joint Exhibit 3) and the Beaumont Area Absence Management Guidelines (Joint Exhibit 4).  Exhibit A, pp. 6-7.

39.    The termination letter dated January 22, 2019 (Joint Exhibit 10) stated in part:

You have been absent from work since December 14, 2018, due to restrictions associated with a short-term disability arising from an alleged on-the-job injury you eventually reported. Since your first day absent, you have submitted significant medical restrictions on your work performance, and have declined to update those restrictions. However, based on video surveillance, you have been observed performing activities that are in direct violation of the medical restrictions you submitted to the company.

You neglected your duty to work. Your actions are in direct violation of the Beaumont Refinery Workplace Conduct Expectations, company policies, and the standards expected of any workforce. Your actions interfered with the maintenance of the workplace by forcing others to work when you are able and needed to do so. You have also failed to take reasonable and appropriate

> action to be at work promptly every scheduled shift under the
> Absence Management Guidelines. Further, you violated Beaumont
> Refinery Workplace Conduct Expectations by intentionally
> misrepresenting facts and/or falsification of personnel, time or
> other company records through your description of the incident
> occurring on November 29, 2018 and of your injury and
> restrictions since that time. (Joint Exhibit #10)

Exhibit A, p. 7.

## Grievance

40.     The Union grieved Holman's termination on January 23, 2019. Joint Exhibit 11.

41.     As required by the CBA, a grievance hearing was held on February 8, 2019.  Joint

Exhibit 12.  Holman attended with two Union Representatives; two individuals attended on

behalf of the Company. *Id.*  At the hearing, Holman had an opportunity to present his side of the

story.  *Id.* He gave his explanation for his activities while off work.  *Id.* He did not present any

letters or new information from Dr. Mathis.  *Id.*

42.     The grievance was denied on February 21, 2019.  Joint Exhibit 13.  In denying the

grievance, the Company's refinery manager stated:

> While Mr. Holman may have attended check-in appointments with
> MOH as required an employee has multiple responsibilities related
> to medical absence.  It is incumbent upon the employee to submit
> and update accurate medical restrictions to the Company as
> appropriate.   This includes submitting revised restrictions as an
> employee's conditions progress.   Mr. Holman submitted his
> medical restrictions to the Company effective December 7, 2018
> and failed to update his restrictions through the course of his
> absence, despite being given reminders and opportunities to update
> those restrictions.
>
> During his absence, Mr. Holman was observed performing
> activities that were in clear violations of the restrictions he
> submitted to the Company.
>
> *Id.*

**Dr. Mathis' Post-Termination  Letters**

43.     Holman returned to see Dr. Mathis on March 20, 2019. On March 21, 2019, Dr. Mathis wrote a letter addressed to "To Whom It May Concern." Union Exhibit 1. In the letter, Dr. Mathis stated that Holman reported that had been terminated. Dr. Mathis stated that the restrictions he placed on Holman were work restrictions and intended to be guidance for his work. He said Holman was instructed "that he could walk as tolerated at home, rest as needed, and to work on rehabbing the hip with some stretching exercises to tolerance." Additionally, Dr. Mathis stated that outside of the work environment Holman was able to tailor his activity within the tolerance of comfort and pain. The Arbitrator considered this letter, which was written almost two months after Holman was terminated, about six weeks after his grievance hearing, and about a month after his grievance was denied, in deciding the just cause issue. Exhibit A, pp. 20-22.

44.     On April 12, 2019, Dr. Mathis wrote another "To Whom It May Concern" letter. Union Exhibit 2. In this letter, he stated:  "I have been asked to review what has been referred to as a timeline of inconsistencies on Mr. Holman's case including photographs and video of surveillance with him." *Id.* Dr. Mathis said:  "I have reviewed his video and picture summary and do not feel that Mr. Holman's actions are inconsistent with his injury."[32] *Id.* The Arbitrator considered this letter, which was written almost three months after Holman's termination and about a month after Holman's grievance concluded, in deciding the just cause issue.  Exhibit A, pp. 20-22.

**Unemployment Claim**

45.     Holman filed an unemployment claim with the Texas Workforce Commission. Joint Exhibit 14.  In his filings, Holman stated:  "I would do things at home against my

---

[32] The letter states that the activities in the surveillance video were not inconsistent with his "injury," but fails to state that the actions were inconsistent with his activity restrictions.

restrictions to see what my pain limit or level would be since I did receive therapy." *Id.* at 12-A.

He said he was climbing on his truck while on medication. *Id.*  He acknowledged: "yes climbing

on my truck would be against my medical restriction. *Id.*

46.     The TWC denied the claim, stating that the Company had good cause to terminate

the employee and noting that he was "Fired. Violation of Company Rules and Policies." *Id.* at.

16-A.  The TWC denied Holman's appeal on April 8, 2019. Joint Exhibit 15. The Appeal

Tribunal Decision stated:

> The employer discharged the claimant for dishonesty.  The final
> incident occurred when the employer learned the claimant, who
> was out on a medical leave of absence, was engaging in activities
> that violated his medical restrictions. The employer had photos and
> videos of the claimant violating his medical restrictions and
> terminated him for dishonesty.

Joint Exhibit 15, p. 2.

## OSHA Retaliation Claim

47.     Next, Holman filed two complaints with OSHA.   Joint Exhibit 16. OSHA

concluded that Holman's "protected activity was not the reason for the adverse employment

action." Joint Exhibit 18, p. 2. OSHA found:

> At the time of the alleged work related accident, the company
> doctor placed Complainant on severe work restrictions since he
> was not able to kneel, bend, or squat. On December 16, 2018,
> while on medical leave, Complainant was caught on video washing
> his vehicle at a car wash doing all the movements the work
> restrictions said he was not able to do. He performed all the
> movements without limitations.

The complaint was dismissed. *Id.* Holman's appeal of that decision was also rejected. Joint

Exhibit 19.

## EEOC Complaint

48.     Holman also filed a complaint with the EEOC.  The EEOC issued the following determination:   "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." Joint Exhibit 20.

## Workers Comp Benefits

49.     Although the Company was skeptical about the injury, the Company did not contest the injury, and Holman received workers compensation benefits for the time he was off work due to the injury.  Exhibit E, 1:33, 41; Exhibit F, 2:303-306, 325-26.

50.     Following his discharge by the Company, Holman went to work as a process operator at Goodyear in January 2020, working straight days, and was working there at the time of the arbitration hearing. Exhibit F, 2:416.

## Arbitration

51.     The parties obtained the arbitrator through the Federal Mediation and Conciliation Service.  The Arbitrator did not disclose (or claim to have) any medical education, degrees, or training.  Although Claimant previously had an artificial hip replacement, the Arbitrator never disclosed that he had undergone two artificial hip replacement surgeries.  The Company learned this fact when the Arbitrator wrote in reference to Holman's testimony on an issue:   "This explanation rang true to the Arbitrator who has two artificial hips and knows a little bit about hip pain." Exhibit A, p. 24.

52.     The only physician to testify at the hearing was Dr. Susan Craig, who met with and talked to Holman on multiple occasions.  Exhibit E, 1:144-65.  She testified about her evaluations and communications with Holman and her discussion with Dr. Mathis after the appointment at which he imposed the restrictions. *Id.*  She viewed the surveillance video and

confirmed that Holman's activities both violated the restrictions that Holman and Dr. Mathis submitted to her and were inconsistent with what Holman was reporting to her.  Exhibit E, 1:159-162, 203-04, 209.

## VII.   ARGUMENT & AUTHORITIES

53.     While federal courts defer to an arbitrator's decision whenever possible, "arbitration awards are not inviolate." *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 991 F.2d 244, 248 (5th Cir. 1993).  Courts properly review arbitration awards to determine whether the arbitrator exceeded his authority, the award stems from evident partiality, or should be vacated on some other ground.  *Id.*  This Award must be vacated for three independent reasons: (1) the Arbitrator exceeded his authority, (2) there was evident partiality, and (3) the Award was not based on the facts in the record and therefore was arbitrary and capricious.

### A.     The Arbitrator exceeded his authority.

54.     When an arbitrator exceeds his authority, judicial deference ends, and the award must be vacated.  *Bruce Hardwood Floors, Division of Triangle Pacific Corp. v. UBC, Southern Council of Industrial Workers, Local Union No. 2713*, 103 F.3d 449, 452 (5th Cir. 1997) ("Where the arbitrator exceeds the express limitations of his contractual mandate, judicial deference ends and vacatur or modification of the award is an appropriate remedy") (vacating an award when the arbitrator exceeded his contractual mandate in refusing to discharge employee and instead imposing a ten-day suspension).  *See also Delta Queen Steamboat Co v. Dist. 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 604 (5th Cir. 1989) ("the rule in this circuit, and the emerging trend among other courts of appeals, is that arbitral action contrary to express contractual provisions will not be respected"); *Hous. Lighting & Power Co. v. Int.'l Bhd. of Elec. Workers, Local Union No. 66*, 71 F.3d 179 (5th Cir. 1995) (holding the arbitrator exceeded his

authority under the agreement when he re-evaluated the employee's qualifications and re-calculated his performance rating).

55.     A court will not uphold an arbitrator's decision "when it dispenses its own 'brand of industrial justice' outside the scope of an arbitration agreement." *American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, International,* 343 F.3d 401, 405 (5th Cir. 2003) quoting *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

56.     This Award must be vacated because the Arbitrator exceeded his authority in two independent respects:  he considered post-terminations letters from Holman's doctor that were not available to the Company when Holman was terminated, and he improperly considered his own personal medical experiences in his decision-making.

### 1.     The Arbitrator exceeded his authority in considering post-termination letters written by Holman's physician.

57.     In his Opinion and Award, the Arbitrator places great emphasis on two "To Whom It May Concern Letters" that were written by Dr. Mathis after Holman's termination. Union Exhibits 1 and 2.  Holman testified that Dr. Mathis decided, on his own, to write these letters out of the goodness of his heart.  Exhibit F, 2:370-371.  That was obviously not the case as Dr. Mathis wrote:  "I have been asked to review what has been referred to as a timeline of inconsistencies on Mr. Holman's case including photographs and video of surveillance with him." Union 2.  And, Dr. Mathis stated in the letter that he had reviewed the video and picture summary. *Id.* It is obvious that somebody asked Dr. Mathis to review videos and photos and write a letter.  Union Exhibit 2.  The exact circumstances will never be known because Dr. Mathis did not testify at the hearing.

58.     But the important point is not whether Dr. Mathis was asked to write the statement and by whom.  Rather, the important point is that the letters, which were dated March 21, 2019 and April 12, 2019, were written several months after Holman's termination on January 22, 2019 and a month after the established grievance process had concluded. Joint Exhibit 10. And, the Arbitrator repeatedly relied on these letters in writing his Opinion and Award.  *See e.g.*, Exhibit A, pp. 20-22.

59.     The Arbitrator exceeded his authority when he considered the two letters that were written after the fact by Dr. Mathis.  The Fifth Circuit decision in *Gulf Coast* is on point. *Gulf Coast Industrial Workers Union v. Exxon Co., U.S.A.,* 991 F.2d 244 (5th Cir. 1993).

60.     In *Gulf Coast*, the court said:   "The inquiry is straightforward: should the arbitrator have relied upon evidence of events that occurred after Woods's discharge." *Id.* at 255. Exxon had argued that the arbitrator exceeded the scope of his authority by considering "post-discharge good works" as a basis for reinstating the employee. *Id.* at 255.  The Union had argued that "an arbitrator may properly condition his just cause determination on numerous factors, even those that arise after termination."  *Id.*  The court held that "the arbitrator erred in basing his decision upon several conclusions concerning Woods's post termination conduct" and that, "[i]n exercising such reliance, Arbitrator Helburn exceeded his proper, contracted-for authority." *Id.* at 257.   The same is true here; the Arbitrator exceeded his proper, contracted-for authority by relying on post-termination letters written by Dr. Mathis.

61.     In reaching its decision, in *Gulf Coast,* the court considered Article Twenty-Six of the applicable collective bargaining agreement which provided "that Exxon 'shall have the right to discipline and discharge employees for just cause.'" *Id.* at 256.   The court noted that the arbitrator "was presented with this stipulated issue:  'Was Thomas W. Woods discharged for just

cause and, if not, what is the appropriate remedy.'" *Id.* Noting that the "first part of the question is worded in the past tense," the court said it was "equivalent to asking, 'Did Exxon possess just cause on June 15, 1990 to terminate Thomas W. Woods.'" *Id.* After carefully reviewing the applicable legal principles and the terms of the parties' collective bargaining agreement, "which strips the arbitrator of authority to 'alter or add to it in any way,'" the court said: "we hold that the arbitrator should have confined his considerations only to the facts as they existed at the time Exxon made its termination decision." *Id.* Instead, the arbitrator relied heavily on post-discharge rehabilitation efforts and that was error. *Id.* at 257.

62.     The *Gulf Coast* analysis is nearly identical. Like Article Twenty-Six of the *Gulf Coast* CBA, Article XI, Section 1 of the CBA applicable to this case provides: "The Company reserves the right to discharge, suspend, or discharge any employee for just cause." Exhibit A, p. 2; Joint Exhibit 1, p. 25. Similar to the stipulated issue in *Gulf Coast,* the stipulated issue in this case was: "Did the Company have just cause to terminate Mr. Anthony Holman? If not, what is the appropriate remedy?" Exhibit A, p. 1. As in *Gulf Coast,* the first question was the equivalent of asking: "Did ExxonMobil possess just cause on January 22, 2019 to terminate Anthony Holman?" Just like the CBA in *Gulf Coast,* the CBA in this case strips the Arbitrator of authority to alter or add in any way. Joint Exhibit 1, p. 18 ("It is understood and agreed that the Arbitration Board shall not have the right to make a decision that would in any way modify, change, add to or delete any of the terms or provisions of the Agreement").

63.     In this case, the Court should hold that the Arbitrator should have confined his consideration only to the facts as they existed at the time the Company made its termination decision and that the Arbitrator should not have considered Dr. Mathis' post-termination letters on the just cause issue. *Gulf Coast*, 991 F.2d at 256. This Court should further conclude that the

Arbitrator exceeded his proper, contracted-for authority in basing his decision upon several letters that were written after Holman's termination and after the grievance process had concluded. *Id.* at 257.

64.     Several other cases have held that, in deciding an arbitration based upon an employee's discharge, an arbitrator is only to look at the evidence before the employer at the time of discharge. *See, e.g. Am. Eagle Airlines, Inc. v. Air Line Pilots Assn*, 343 F.3d 401 (5th Cir. 2003).

65.     In *STP Nuclear Operating Co., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 66*, the arbitrator found that STP had just cause to suspend and fire Phillips based on the information it had available when it made those decisions but the "arbitrator nonetheless ordered STP to reinstate Phillips, relying on evidence that did not exist until two months after Phillips was fired to find that STP did not have just cause to do so." No. H-05-3561, 2006 WL 1877099, *1 (S.D. Tex. July 6, 2006).  The evidence that the arbitrator considered was a physician's letter dated two months after the termination.  *Id.* at 3.  The physician stated that "[d]ue to an incomplete understanding of his work status, he has evidently been let go from his job." *Id.* In the letter, the doctor explains that his office gave the employee conflicting forms and that "fault lies with my office and with me . . ." *Id.* The physician asked that the employer rescind the decision to let the employee go if it was based on him not reporting to work. *Id.* "The arbitrator was charged with answering two questions: Was Phillips discharged for cause? If not, what shall be the appropriate remedy?"  *Id.* The court held that the arbitrator exceeded his contractual authority by ordering reinstatement based on the post-termination letter. *Id.* at *8.  The award was vacated.

66.     Here, as in *Gulf Coast* and *STP*, the Arbitrator exceeded his contractual authority by considering the two letters written by Dr. Mathis after Holman was terminated.

67.     The Arbitrator knew that it was improper for him to consider the two post-termination letters. Exhibit A, pp. 21-22. *See also* Exhibit F, 2:312 (the Arbitrator said: "Well, we're reviewing the decision that the Company made at the time of termination . . .). Since it was improper to consider the two post-termination and post-grievance letters, the Arbitrator tried to justify his conduct in two ways. First, the Arbitrator said that the Company should have given Holman a chance to explain the reason for the off-duty activities shown on photos and videos. Exhibit A, p. 24. But, Holman did have an opportunity to explain and did present his explanation during the grievance hearing that took place on February 8 as part of the grievance process that was established by the CBA.   Joint Exhibit 12; Exhibit B, Section V, p. 16. Second, the Arbitrator said that Company should have called consulted Dr. Mathis before the discharge. Exhibit A, p. 25.   *See also* Exhibit A, p. 24 (listening to Holman's explanation might have "prompted a call to Dr. Mathis to obtain his perspective on Mr. Holman's non-work activities"). But, Dr. Craig did call Dr. Mathis and talked to him following Holman's December 5 appointment.   Exhibit E, 1:138. And she had the benefit of the Texas Workers' Compensation Work Status Report filled out by Dr. Mathis that clearly stated: "Note – these restrictions should be followed outside of work as well as at work." Joint Exhibit 23.  There was no reason to think that Dr. Mathis, an experienced orthopedic surgeon who had operated on Holman many years earlier, did not know what he was doing when he completed and signed the Texas Worker's Compensation Work Status Report that imposed Activity Restrictions on Holman.   Exhibit F, 2:343. Dr. Craig reviewed the surveillance and concluded that Holman's activities in bending, stooping, and climbing were inconsistent with the restrictions. Exhibit E, 1:172. Moreover, if the

Union and Holman had wanted the Company to consider Dr. Mathis' views on the matter, they could have presented that information at the grievance hearing, but they did not.  Joint Exhibit 12.

68.     The case law is clear.  The Arbitrator exceeded his authority by relying heavily upon two post-termination, post-grievance hearing letters written by Dr. Mathis.  The Arbitrator is guilty of exercising his own brand of industrial justice outside the scope of the CBA.  In so doing, he exceeded the authority given to him under the CBA; the arbitration award must be vacated.

### 2.     The arbitrator exceeded his authority when he improperly considered his own medical experiences in his decision-making.

69.     After improperly considering Dr. Mathis' post-termination letters, the Arbitrator turned his attention to Holman's testimony, stating that if Holman had been interviewed before discharge, he could have shared his explanations for the activities observed in the videos and photos and explained that "he could take his medications (muscle relaxants and anti-inflammatories) while he was not working, and, as a result, he could do more." Award, p. 24. Then the Arbitrator said: "This explanation rang true to the Arbitrator who has two artificial hips and knows a little about hip pain." Exhibit A, p. 24.

70.     Aside from ignoring the fact that Holman had the opportunity to share his explanation for the activities observed in the videos/photos at the grievance hearing and aside from demonstrating evident partiality with respect to this statement and others as discussed in section VII (B) herein, the Arbitrator exceeded his authority when he considered his own personal medical experiences in deciding this dispute and in writing his Opinion and Award.

71.     The CBA in this matter contains a section on Arbitration that permits the parties to use the Federal Mediation and Conciliation Service ("FMCS") to obtain an arbitrator.  Joint

Exhibit 1, p. 17.  That is what the parties did in this case; the Arbitrator was on the FMCS' list of arbitrators.  The FMCS and its employees, mediators, and arbitrators are subject to chapter XII of Title 29 of the Code of Federal Regulations.

72.     The Code of Federal Regulations governs the conduct of hearings conducted by FMCS arbitrators. 29 CFR § 1404.13.  That provision states: "The conduct of the arbitration proceeding is under the arbitrator's jurisdiction and control, and the *arbitrator's decision shall be based upon the evidence and testimony presented at the hearing* or otherwise incorporated in the record of the hearing."  *Id.* (emphasis added).

73.     Holman had a previous hip replacement surgery and was now alleging hip pain. Here, the Arbitrator served as an undisclosed witness on the issue of hip pain in the setting of prior hip replacement surgery, a witness that the Company did not have an opportunity to cross-examine.  And, while the Arbitrator stated in the award that he accepted Holman's explanation based on the Arbitrator's own personal experience with hip replacement surgery and hip pain, the Company is left to wonder what other personal medical information influenced the Arbitrator, unbeknownst to the Company and completely outside of the record.

74.     The Arbitrator exceeded his authority by considering his own personal medical experiences—evidence that was not presented at the hearing-- in reaching his decision.  This too requires vacatur of the Award.

**B.     There is evident partiality by the Arbitrator.**

75.     The Award should be vacated because of evident partiality.  *Cooper v. Westend Capital Management, L.L.C.*, 832 F.3d 534 (5th Cir. 2016).  There are two types of evident partiality: actual bias and non-disclosure. *See e.g. Positive Software Solutions, Inc., v. New Century Mortg. Corp.*, 476 F.3d 278, 285 (5th Cir. 2007) ("Ironically, the 'mere appearance'

standard would make it easier for a losing party to challenge an arbitration award for nondisclosure than for actual bias").

76.     Here, the Award should be vacated because of actual bias and non-disclosure.

### 1.     Actual Bias

77.     "To establish evident partiality based on actual bias, the party urging vacatur must produce specific facts from which a 'reasonable person would have to conclude that the arbitrator was partial to one party.'" *Householder Grp. v. Caughran*, 354 Fed. Appx. 848, 852 (5th Cir. 2009) quoting *Webber v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 455 F.Supp2d 545, 550 (N.D. Tex. 2006) (citations and internal quotations omitted). The alleged partiality must be direct, definite, and capable for demonstration rather than remote, uncertain, or speculative. *Caughran*, 354 Fed.Appx. at 851.

78.     The Arbitrator's partiality is obvious in this case.  A pivotal issue was whether the Company had just cause for terminating Holman for violating the Activity Restrictions that were submitted to the Company in the Work Status Report, which was signed by both Holman and his physician.   Exhibit A, p. 7; Joint Exhibit 23.   The Company doctor reviewed the surveillance videos and concluded Holman violated the activity restrictions which covered both work and non-work activities.  Exhibit E, 1:159-162; 203-204; 208-209; Joint Exhibit 23.

79.     In addressing this key issue in the Award, the Arbitrator demonstrated evident bias:

> Involving Mr. Holman in the investigation could have provided the Company with useful information if its objective was to conduct a full and fair review of his situation.  For example, if he had been interviewed prior to being discharged, he could have shared his explanation for the activities observed in the videos.  In his testimony, he explained that he could take his medication (muscle relaxants and anti-inflammatories) while he was not working, and as a result he could do more.  **This explanation rang**

> **true to the Arbitrator who has two artificial hips and knows a**
> **little bit about hip pain.**  Because Mr. Holman had not been
> heard, such factors were not considered as part of the Company's
> investigation.  Even if the Company doubted the explanations he
> provided for his actions, listening to Mr. Holman's side of the
> events might have prompted a call to Dr. Mathis to obtain his
> perspective on Mr. Holman's non-work activities. By contacting
> Dr. Mathis, the Company would have learned that he did not
> intend for the medical restrictions to apply during non-work hours.

Exhibit A, p. 24 (emphasis added).

80.     The evidence of actual bias comes from the Arbitrator's very own words:  "This explanation rang true to the Arbitrator who has two artificial hips and knows a little about hip pain."  That one statement says it all.  The Arbitrator wholly accepted Holman's testimony because of his own personal (and undisclosed) medical problems—namely his personal experience with two total hip replacements.

81.     But, the evidence of actual bias goes well beyond that—again from the Award itself.  The Arbitrator relied heavily upon two letters written by Holman's doctor several months *after* the termination and a month or more after his grievance process ended. Exhibit A, pp. 20-24.  The Arbitrator did this even though he admitted that he "would not normally give much consideration to letters such as the two prepared by Dr. Mathis."[33] Exhibit A, p. 21. But, in one paragraph that starts on page 21 of the Award and ends on page 22, the Arbitrator tried to explain his rationale for deviating from his usual practice, saying this:

(1)     In reference to Dr. Mathis' two "To Whom It May Concern" letters, the Arbitrator said: "Although admissible as hearsay, they probably would not have been given

---

[33] As stated by the Arbitrator, the letters would be considered hearsay because Dr. Mathis had not been called as a witness at the arbitration hearing.  Exhibit A, p. 21.

as much weight as Dr. Craig's testimony that was subject to cross-examination by the Union."[34] Exhibit A, p. 21.

(2)   "Another consideration was that the letters had been prepared after the termination decision had been made.  The Arbitrator's usual approach would have been to hold that the purpose of the arbitration process was to review the Company's decision at the time it had been made.  Because the Company did not have the letters at that time, their content could not have influenced the decision."[35] Exhibit A, pp. 21-22.

(3)   "However, to adopt this approach would have precluded the Arbitrator from giving proper consideration to Dr. Mathis' pertinent views concerning Mr. Holman's restrictions."[36] Exhibit A, p. 22

(4)   "Therefore, [the Arbitrator] says it was necessary to enter the letters into the record and give them their proper weight." Exhibit A, p. 22.

82.   This is a complete *non sequitur*.  The Arbitrator is in essence saying that, if he did the right thing, if he did what he usually does, he could not consider the letters, which were

---

[34] The "proper weight" the Arbitrator deemed necessary was to give these letters more weight than the testimony of Dr. Craig, who testified live and unrefuted at the arbitration hearing. Exhibit A, p. 20. Dr. Craig testified that she received the Work Status Form from Dr. Mathis which identified "activity restrictions" that were to be applied both at work and outside of work, and also spoke to Dr. Mathis following Holman's only visit to Dr. Mathis between the incident and his last visit with Dr. Craig. Exhibit E, 1:138, 209. Dr. Craig testified that the after-the-fact letters were never sent to her, and that Dr. Mathis never communicated to her in writing or by phone that the restrictions were for work only. *Id.* at 1:207.  However, the Arbitrator nonetheless believed that a "more important consideration was that the restrictions specified in the Workers' Compensation form were inconsistent with Dr. Mathis' intent" -- even though it was Dr. Mathis who filled out and signed the form.

[35] The Arbitrator's usual approach would have been the correct approach. In fact, in deviating from his usual approach, the Arbitrator exceeded his authority.  *See* Section VII (A) (1).

[36] If the Arbitrator wanted to know Dr. Mathis' views, he needed to look no further than the Texas Workers' Compensation Work Status Report that Dr. Mathis signed on December 5, 2018 and that remained in effect until January 2019.  Joint Exhibit 23. That form, signed by doctor and patient, clearly stated what the patient could and could not do and clearly stated they were work and non-work restrictions. Moreover, there is an assumption on the Arbitrator's part that Dr. Mathis would have said the same thing in December 2018 or January 2019, before his patient was terminated, as he did in March and April 2019, after his patient was terminated.. That is completely speculative.

written several months after the termination and a month or more after the conclusion of the grievance process by a witness who was not subject to cross-examination.  But, he says: I want to know what the doctor has to say about Holman's restrictions, so I am going to consider the letters anyway.  The end justifies the means.  The end justifies, in the Arbitrator's mind, the complete abandonment of his usual, customary, appropriate, and perfectly reasonable practice.

83.    Why would the Arbitrator go to such lengths to defend the indefensible—defend his reliance on Dr. Mathis' after-the-fact statements that were not subject to cross-examination? He plainly stated: it was because he wanted to consider the statements even though he ordinarily would not.   These statements were favorable to Holman, and the Arbitrator exceeded his jurisdiction in considering them and in linking Holman's injuries to his own. Again, why would the Arbitrator abandon what he admits is his usual practice, a practice that was appropriate, reasonable, and did not exceed his authority?  Because he wanted to dispense his own brand of industrial justice.

84.    In these circumstances, a reasonable person would have to conclude that there is evident partiality in favor of Holman and against the Company. *Householder Grp. v. Caughran,* 354 Fed. Appx. at 852. That is why the Arbitrator said, "This explanation [Holman's explanation] rang true to the Arbitrator who has two artificial hips and knows a little bit about hip pain." Exhibit A, p. 24.   And that is why a reasonable person would believe that the Arbitrator engaged in mental gymnastics and twisted logic to justify consideration of and reliance on the Mathis post-termination statements.

85.    The Arbitrator's partiality is blatant.  The Arbitrator displayed evident partiality towards Holman and the Union and actual bias against the Company.  That partiality was on display when the Company lawyer mentioned that the contract requires an opinion in sixty days.

The Arbitrator responded: "Yeah, I've been doing this for over forty years.  I've never been more than 30 days[37] . . .We've got a person's job on the line here.  We can't dink around, even though you've taken over a year to get to arbitration, guys, which isn't very good."[38] Exhibit F, 2: 465-66.  In support of Holman, the Arbitrator cited his own hip problems.  And in support of Holman, he tried to rationalize considering two post-termination letters written in support of Holman that, by his own admission, he usually would not consider.[39]  This partiality is direct, definite, and capable of determination; it is not remote, uncertain, or speculative.  It is actually written in the Award.  The evidence of actual bias justifies vacatur on the grounds of evident partiality.

### 2.      Non-Disclosure

86.      In addition to actual bias, evident partiality can be shown by non-disclosure.  The Arbitrator in this case, selected from the FMCS, is bound by the Arbitrator Code of Professional Responsibility ("Code") applicable to the FMCS. Exhibit C. Pursuant to the Code, the Arbitrator, prior to accepting an appointment, must disclose to the parties any close personal relationship *or other circumstance*, which might reasonably raise a question as to the arbitrator's impartiality. *Id.* at Section 2.B(3) (emphasis added).

87.      "If the circumstances requiring disclosure are not known to the arbitrator prior to acceptance of appointment, disclosure *must* be made when such circumstances become known to the arbitrator." *Id.* at Section 2.B(4) (emphasis added). "The burden of disclosure rests on the arbitrator." *Id.*, at Section 2.B(5). At no point did the Arbitrator, upon learning of his close

---

[37] Maybe so, but he took more than 60 days this time.
[38] The arbitration date was agreed to by the parties.
[39] At every significant turn in this arbitration, the Arbitrator favored Holman. For example, the Arbitrator held that the Company had to prove its case by clear and convincing evidence.  Exhibit A, p. 17.  The Company does not challenge this  as an "error of law" but, rather, as evidence of evident partiality.

connection and personal experience with the Holman's medical conditions and complaints, disclose the Arbitrator's medical issues to the parties. This was a clear violation of the Code.

88.     "To evaluate evident partiality in nondisclosure cases, the Fifth Circuit has adopted the "reasonable impression of bias standard" that is "interpreted practically rather than with utmost rigor." *Positive Software Solutions*, 476 F.3d at 283. The standard is typically used in nondisclosure cases to evaluate prior relationships between an arbitrator and the parties. Thus, the court said: "the resulting standard is that in nondisclosure cases, an award may not be vacated because of a trivial or insubstantial prior relationship between the arbitrator and the parties to the proceeding." *Id.*

89.     While the standard is typically used to evaluate relationships between an arbitrator and the parties, there is no reason it should not also be used in circumstances where the nature of the dispute warrants disclosure.  Surely disclosure should be required in other circumstances such as when an arbitrator has personally filed a substantially similar claim against a similar defendant.  In a consumer dispute, perhaps an arbitrator has previously sued a company that repeatedly calls and offers to sell a car warranty.  If he is asked to arbitrate a similar case against another company, should he not be required to disclose it?  What if an arbitrator has sued a nursing home for neglect of his elderly mother that led to pressure sores that caused her death?  When asked to arbitrate a nursing home case involving a different patient and a different nursing home with similar allegations, should the arbitrator not be required to disclose it?

90.     Here, there is a substantial, non-trivial relationship between the hip replacements of the Arbitrator and Holman such that the Arbitrator's own hip problems impacted him and his decision-making to the point that he wrote about his own personal medical problems in the

Award and abandoned a number of his usual practices in rendering his decision.  He also brought with him all of his beliefs and perceptions concerning working with hip issues.  The first time the Company, its lawyers, or representatives learned about the Arbitrator's hip problems was when they read about them on page 24 of the Award. When the Arbitrator learned that this case centered on the restrictions and appropriate activities of a person who had hip replacement surgery and alleged an injury and hip pain, he should have—in fact he was ethically bound to—notify the parties, especially given that he wrote: "This explanation rang true to the Arbitrator who has two artificial hips and knows a little bit about hip pain." Exhibit A, p. 24.

91.     It was bad enough that the Company did not get to cross-examine Dr. Mathis on his after-the-fact letters and the circumstances surrounding them. It is even worse that, unbeknownst to the Company, the Arbitrator was a witness, one that was not disclosed until the Award was entered and one that the Company did not get to cross-examine.

92.     The Company proved evident partiality.  Speculation is not required. The words came from the Arbitrator's own pen.  The award should be vacated.

### C.     The Award was not based on the facts of the case and was therefore arbitrary and capricious.

93.     The Fifth Circuit has made it clear that an arbitrator is not a free agent dispensing his own brand of industrial justice. *Safeway Stores v. Am. Bakery and Confectionery Worker's Int'l Union, Local 111*, 390 F.2d 79 (5th Cir. 1968). If the award is arbitrary, capricious or not adequately grounded in the basic collective bargaining contract, it will not be enforced by the courts. *International Ass'n of Machinists v. Hayes Corp.*, 296 F.2d 238, 244 (5th Cir. 1961). When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but

to refuse enforcement of the award. *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

94.     An award is "arbitrary and capricious" when "a ground for the arbitrator's decision cannot be inferred from the facts of the case." *Lummus Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*, 256 F.Supp.2d 594, 605 (S.D. Tex. 2002), citing *Ainsworth v. Skurnick*, 960 F.2d 939, 941 (11th Cir. 1992). The Arbitrator faulted the Company for its failure to interview Holman and believed such an interview would have allowed Holman to explain away his blatant violations of the activity restrictions. Exhibit A, p. 24. In reaching this conclusion, the Arbitrator relied upon his own personal experience, rather than the facts: "This explanation rang true to the Arbitrator who has two artificial hips and knows a little bit about hip pain." Exhibit A, p. 24.

95.     The CBA allows the Company to discharge any employee for just cause. Joint Exhibit 1, p. 25. Holman met with the Company's MOH on multiple occasions to explain his situation, and continued to describe his pain and condition in a way that was inconsistent with his observed activities. Exhibit E, 1:144-165. Dr. Craig testified about her evaluations and communications with Holman, her discussion with Dr. Mathis following the appointment at which Dr. Mathis imposed the restrictions, and the opportunities Holman had to update his restrictions and/or report changes to his conditions. *Id*. She viewed the surveillance video herself and confirmed that Holman's activities both violated the restrictions he and Dr. Mathis submitted to her, and were inconsistent with what Holman was reporting to her. Exhibit E, 1:159-162; 203-204; 208-209.

96.     The Arbitrator, because of his undisclosed prior hip surgeries, placed himself in the position of Holman and relied upon his own experiences rather than the evidence presented

in the case in making his determination. He failed to consider the testimony of the only live medical expert witness,[40] ignored the lack of any new significant hip problem in Holman's medical records,[41] and dismissed the Company's policies requiring the employee to advise MOH of changes in his conditions and update his medical restrictions, and instead applied his own brand of justice because he had undergone hip surgeries and "knows a little bit about hip pain." Exhibit A, p. 24. The Arbitrator's ground for the Award cannot be inferred from the facts of the case or the evidence submitted.  Instead, the Award is arbitrary and capricious and vacatur is required.

97.    Further, as set forth more fully in Section VII (A)(1), the Arbitrator's decision was not adequately grounded in the CBA. He was required to consider only those facts that existed at the time of the termination. Joint Exhibit 1, p. 18. Instead, the Arbitrator based his Award on Dr. Mathis' two post-termination letters, giving them more weight than Dr. Craig's live testimony. Exhibit A, p. 20. Because the Arbitrator's decision was not adequately grounded in the CBA, it was arbitrary and capricious.  *Gulf Coast.*, 991 F.2d at 256. The Award should be vacated.

## VIII.   <u>CONCLUSION</u>

98.    The award must be vacated because the Arbitrator exceeded the authority given to him and displayed evident partiality.  In addition, the Award was not based on the facts and, therefore, was arbitrary and capricious.

99.    WHEREFORE PREMISES CONSIDERED, the Movant prays that the Court vacate the Opinion and Award of the Arbitrator, reinstate the discharge, enjoin enforcement of

---

[40]  Instead, the Arbitrator explicitly stated that the after-the-fact letters from Dr. Mathis, who was not subject to cross examination, were a "more important consideration" than the testimony of Dr. Craig. Exhibit A, p. 20.
[41]  Victory Hospital identified no injury, Exhibit E, 1:131 and Dr. Mathis diagnosed a "strained hip." Exhibit E, 1:137; Company Exhibit 6.

the Award, and award the Company the court costs and such other and further relief as the court

determines appropriate.

Respectfully submitted,

By: _Michele Smith_
     Michele Y. Smith, Of Counsel
     Texas Bar No. 00785296
     michelesmith@mehaffyweber.com
     Maryalyce W. Cox, Of Counsel
     Texas Bar No. 24009203
     maryalycecox@mehaffyweber.com
     Patricia D. Chamblin
     Texas Bar No. 04086400
     patriciachamblin@mehaffyweber.com
     MehaffyWeber, P.C.
     2615 Calder Avenue, Suite 800
     Beaumont, Texas 77702
     Telephone:  (409) 835-5011
     Telecopier:  (409) 835-5177
     ATTORNEYS FOR PETITIONER/MOVANT,
     EXXONMOBIL OIL CORPORATION

## CERTIFICATE OF SERVICE

The Union was served with process through its attorney, Jacqueline Ryall of the Provost Umphrey Law Firm.  Ms. Ryall agreed to accept service of process on behalf of her client, and, as agreed, she has been served with this Motion via email and hand-delivery on this the 13th day of July, 2020.

_Michele Smith_
MICHELE Y. SMITH

40